IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RISO, INC., a
Massachusetts corporation,

                 Plaintiff,                          No. 03:13-cv-02064-HZ

      v.

WITT COMPANY, an Oregon                  OPINION & ORDER
corporation, WILLIAM D. WITT, an
individual, and GARY EDNER, an
individual,

                 Defendants.

Thomas M. Triplett
Richard K. Hansen
Roman D. Hernandez
SCHWABE, WILLIAMSON & WYATT, P.C.
1900 Pacwest Center
1211 S.W. Fifth Avenue
Portland, Oregon 97204

/ / /

/ / /

1 - OPINION & ORDER

Edwin G. Harvey
Matthew J. Landwehr
David M. Mangian
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101

      Attorneys for Plaintiff

John F. McGrory, Jr.
Kaley L. Fendall
DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue
Suite 2400
Portland, Oregon 97201

      Attorneys for Defendants

HERNANDEZ, District Judge:

      Plaintiff RISO, Inc. brings this action against Defendants Witt Company and two Witt

Company executives: William Witt and Gary Edner. Most of the claims are based on RISO's

contention that Witt Company, previously an authorized dealer of RISO products, defrauded

RISO by submitting unsupported reimbursement claims to RISO under RISO's "Price Support

Programs." Defendants move to dismiss the case based on a contractual arbitration clause. I

grant the motion because I agree with Defendants that other than the injunctive relief portion of

the Lanham Act claim, all of the claims are subject to the arbitration provision.

## BACKGROUND

      RISO is the United States distributor of certain imaging and printing products. First Am.

Compl. at ¶ 6. From August 1, 1989 to May 31, 2013, Witt Company was an authorized RISO

dealer. Id. at ¶ 7. During that time, Witt Company engaged in the distribution, sale, lease, rental,

installation, maintenance, refurbishment, and servicing of RISO's products, including digital

2 - OPINION & ORDER

duplicators, accessories, supplies, parts, and related products now or in the past distributed by RISO. Id. at ¶ 8.

Defendant William Witt is the President of Witt Company and was actively involved in the operations and management of Witt Company. Id. at ¶ 11. He directly or indirectly owns Witt Company and controls, participates in, and directs Witt Company's operations, including its day-to-day functions. Id. Defendant Gary Edner is Corporate Operations Manager for Witt Company and was and is actively involved in the operations and management of Witt Company. Id. at ¶ 12.

RISO sells its products in the United States primarily through 160 independently owned and operated dealers. Id. at ¶ 16. These dealers then resell the products to end-users/customers. Id. RISO's digital duplicators consume two supply products: inks and masters. Id. at ¶ 17. RISO sells its products, including inks and masters, at wholesale to its dealers at dealer published prices. Id. at ¶ 18. Those dealers then make retail sales of the products to end-users. Id.

The parties and their commercial relationship are not strangers to this Court. In 2013, Witt Company filed suit against RISO contending that RISO's insistence that Witt Company purchase supplies along with digital duplicators violated the "anti-tying" provisions of federal antitrust laws. Witt Co. v. RISO, No. 03:13-cv-00166-HZ (hereinafter "the 2013 Antitrust Litigation"). Witt Company also brought claims of intentional interference with business relations, breach of contract, and breach of the duty of good faith and fair dealing. I denied Witt Company's motion for a preliminary injunction and then granted RISO's motion to dismiss. Although I gave Witt Company leave to amend as to some of its claims, Witt Company elected not to file an amended complaint and a Judgment was filed in July 2013.

3 - OPINION & ORDER

Witt Company was a party to several "Dealer Agreements" with RISO during the time it was a RISO authorized dealer.  See 2013 Antitrust Litigation, No. 03:13-cv-00166-HZ, June 7, 2013 Op. & Ord. [58] at 3 (Witt Company "entered into several RISO Domestic Dealer Agreements (Dealer Agreements) from time to time which set forth the terms and conditions of the parties' business relationship.").  The last express Dealer Agreement executed by the parties was one governing Fiscal Year 2008, referred to herein as the FY 2008 Dealer Agreement.  See id. at 3-4 (noting that the parties signed the FY 2008 Dealer Agreement on April 1, 2007).

All of the Dealer Agreements to which Witt Company was a party included some sort of Price Support Program.  As alleged in the First Amended Complaint, RISO dealers often face pricing competition.  First Am. Compl. at ¶ 19.  Requests for proposal, bid requests, or other forms of solicitation are routinely awarded to the lowest-priced bidder whose product meets the qualifications.  Id.  Pricing competition also arises when a retailer of competitive products directly approaches the dealer's existing or prospective customers and offers competitive products.  Id.  To assist its dealers to more effectively compete for or to retain a customer's business, RISO maintains a pricing support program referred to as "Price Support" through which RISO furnishes financial credit to its dealers in certain competitive pricing situations.  Id. at ¶ 20. The dealer sells the products to the customer at a reduced price, but RISO shares the burden of the price reduction when it provides Price Support so that the dealer may obtain or retain the business rather than lose the bid or customer to a competitor.  Id. at ¶ 22.  Price Support lowers the wholesale price by lowering the cost to the dealer through an after-purchase rebate credit (or at times by an up-front discount) and results in less money to RISO for the sale of products to the dealer.  Id.

4 - OPINION & ORDER

To be eligible for Price Support, the RISO dealer must submit a pre-bid Price Support application to RISO. Id. at ¶ 25. There, the dealer provides details regarding the bid/competitive situation, and identifies the customer, machines, accessories, and supplies that are being bid. Id. The dealer also identifies the competition the dealer reasonably anticipates it is facing. Id. RISO reviews the application and if approved, it issues the dealer a "Price Support Letter" verifying the price the dealer intended to propose to the customer and specifying which products are being supported. Id. at ¶ 27. The Price Support Letter also states the maximum price at which the dealer can sell the product to the customer in order to be eligible to receive Price Support credit on that sale. Id. Generally, a dealer sells the RISO product for whatever price it wants. However, to receive Price Support credit, the dealer must sell the product for a price at or less than the maximum price stated in RISO's Price Support Letter approving the dealer's Price Support application. Id. at ¶ 28.

If the dealer wins the customer's business, the dealer purchases the applicable RISO products from RISO at the dealer's then-current dealer pricing and sells the products to the customer. Id. at ¶ 30. The dealer then must submit additional paperwork to RISO requesting a credit for the difference between the price at which the dealer purchased the products from RISO and the Price Support amount. Id. at ¶ 31 (noting that the three required documents are collectively referred to as the "Credit Request Documentation"). If the dealer timely submits the Credit Request Documentation and the information submitted is accurate, RISO issues the dealer a cash credit that can be used by the dealer to pay RISO invoices for products. Id. at ¶ 35. Since April 2002, Witt Company has received Price Support from RISO through this program in a total amount exceeding $2 million. Id. at ¶ 36.

5 - OPINION & ORDER

In the course of expedited discovery in the 2013 Antitrust Litigation, RISO obtained copies of 2,935 invoices reflecting the sale of non-RISO brand inks and masters which Witt Company issued to its customers between April 1, 2011 and March 28, 2013. Id. at ¶ 45. In comparing those invoices with invoices Witt Company had previously submitted to RISO in order to obtain Price Support credit, RISO found that thirty-three of the litigation invoices were materially different from the matching counterpart submitted by Witt Company for a Price Support credit, including differences in price, quantity, and/or product sold. Id. at ¶¶ 47, 50. The litigation invoices also showed the sale of Witt Company brand generic supplies, whereas the corresponding invoices submitted for Price Support credit showed the products sold as genuine RISO supplies. Id. RISO contends that Witt Company submitted invoices and received Price Support credit from RISO for the sale of non-RISO supplies. Id. at ¶ 51. Additionally, RISO contends that Witt Company received Price Support credit for sales made well above the price approved by RISO for Price Support. Id. at ¶ 52. The thirty-three invoices that RISO examined showed that RISO paid $9,247.15 in Price Support to Witt Company for the products on those invoices. Id. at ¶ 56.

RISO then sent records requests, pursuant to the appropriate state freedom of information laws, to a number of public school districts in Oregon, Washington, California, and Arizona. Id. at ¶ 59. RISO received hundreds of invoices back from the schools. Id. at ¶ 61. Of those, only twenty-seven were not materially different in terms of price, quantity, or product, from the Price Support customer invoices that had been submitted to RISO by Witt Company to obtain Price Support credit. Id. RISO alleges that its investigation is continuing but as of the time it filed its Amended Complaint in this case, a comparison of the school invoices with the corresponding

counterparts submitted for Price Support credit shows that approximately ninety percent of the invoices submitted by Witt Company for Price Support were materially altered from the actual customer invoice.  Id. at ¶ 66.

RISO alleges that its investigation to date confirms that since at least 2006, all three Defendants were engaged in a scheme to defraud RISO whereby they knowingly created false and fraudulent invoices purporting to show Witt Company made sales to customers which qualified for the Price Support Program, submitted the fraudulent invoices to RISO, and requested and received Price Support from RISO based on the fraudulent invoices.  Id. at ¶ 68. On information and belief, RISO alleges that this fraudulent scheme started earlier than 2006 and perhaps as early as 2002 or earlier.  Id.

Based on these allegations, RISO brings the following claims:

(1)  Count I:  fraud, fraudulent misrepresentation, and/or intentional misrepresentation against Witt Company, William Witt, and Edner;

(2)  Count II:  a claim under the Massachusetts Consumer Protection Act, M.G.L.A. 93A § 2, against Witt Company, William Witt, and Edner alleging that the actions alleged constitute unfair and deceptive acts or practices in the course of trade or commerce;

(3)  Count III:  conversion against Witt Company;

(4)  Count IV:  money had and received against Witt Company;

(5)  Count V:  unjust enrichment against Witt Company;

(6)  Count VI:  suit on account against Witt Company;

(7)  Count VII:  a RICO claim under 18 U.S.C. § 1962(c) against William Witt and Edner alleging that they engaged in a pattern of racketeering activity consisting of hundreds of acts of

mail and wire fraud;

(8) Count VIII:  a RICO claim under 18 U.S.C. § 1962(d) against William Witt and Edner alleging that they conspired to engage in a pattern of racketeering activity consisting of hundreds of acts of mail and wire fraud[1];  and

(9) Count IX:  a claim for unfair competition under the Lanham Act, 15 U.S.C. § 1125, against Witt Company.  Id. at ¶¶ 78-195.

All but two claims arise from the alleged fraudulent Price Support invoice scheme. Count VI for suit on account alleges that in response to requests from Witt Company, RISO furnished Witt Company with RISO equipment, parts, and supplies in the amount of $123,819.68 and sent Witt Company invoices for those goods which Witt Company has allegedly refused to pay.  Id. at ¶¶ 118-125.  The unfair competition claim in Count IX contends that despite the expiration of its authorized dealer status on May 31, 2013, Witt Company continues to associate itself with RISO as an authorized dealer, including but not limited to representations made on Witt Company's website.  Id. at ¶ 189.  RISO alleges that these representations by Witt Company are likely to cause confusion or cause mistake or to deceive as to the affiliation, connection, or association of Witt Company with RISO, or as to the origin, sponsorship, or approval of Witt Company through its good or commercial activities by RISO.  Id. at ¶ 191.

## STANDARDS

Where the court lacks subject-matter jurisdiction, the action must be dismissed.  Fed. R.

---

[1]  18 U.S.C. § 1962(c) makes it unlawful for "for any person employed by . . . any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt"; 18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate" subsection (c).

Civ. P. 12(b)(1).  A motion to compel arbitration is appropriately raised pursuant to Rule

12(b)(1).  See Geographic Expeditions. Inc. v. Estate of Lhotka ex rel. Lhotka, 599 F.3d 1102,

1104 (9th Cir. 2010).  In considering a Rule 12(b)(1) motion, the court may consider evidence

outside the pleadings to resolve factual disputes.  Robinson v. United States, 586 F.3d 683, 685

(9th Cir. 2009).

    The Federal Arbitration Act, 9 U.S.C. §§ 1-16 (FAA), removes the court's subject matter

jurisdiction to hear the claim when there is a valid, enforceable arbitration clause.  Therefore,

Defendants' motion to dismiss is "one means to raise its arbitration defense.  In effect,

[Defendants'] motion is a petition to this court within the meaning of § 4 of the FAA."  Rogue v.

Applied Materials, Inc., No. 03:03-cv-1564-ST, 2004 WL 1212110, at *4 (D. Or. Feb. 20, 2004),

adopted by J. Brown (D. Or. June 1, 2004) .

    The FAA states that written agreements to arbitrate arising out of transactions involving

interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as

exist at law or in equity for the revocation of any contract."  9 U .S.C. § 2.  If the issue is

referable to arbitration under the agreement, then the court must direct the issue to arbitration and

stay the trial.  9 U.S.C. § 3.  An agreement to arbitrate is to be "rigorously enforce[d.]"  Dean

Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985).

    Courts strongly favor arbitration and broadly construe arbitration clauses.  E.g.,

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985) ("any

doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration")

(internal quotation marks omitted); Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 719 (9th Cir.

1999) ("The standard for demonstrating arbitrability is not high").

As Judge Stewart explained in a 2010 opinion:

The court's role under the FAA is limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms.

Morrow Equip. Co., v. Baker Concrete Constr., Inc., No. 03:09-cv-1335-ST, 2010 WL 4483914, at *4 (D. Or. June 8, 2010) (internal quotation marks omitted), adopted by J. Haggerty (D. Or. Nov. 1, 2010).

DISCUSSION

The arguments made in this motion require discussion of the following issues: (1) the Price Support claims against Witt Company (meaning all claims other than Counts VI and IX), arising before the expiration of the FY 2008 Dealer Agreement; (2) the Price Support claims against Witt Company arising after the expiration of the FY 2008 Dealer Agreement; (3) whether the arbitration provision applies to the Price Support claims against William Witt and Edner (meaning Counts I & II and the RICO claims in Counts VII and VIII); and (4) whether the arbitration provision applies to the non-Price Support claims (meaning Counts VI and IX).

I. The Dealer Agreements' Arbitration Provisions and Effective Dates of Express Agreements

   A. Arbitration Agreements

      1. 1998 and 2003 Dealer Agreements

From at least as early as 1998, RISO's Dealer Agreements have contained an arbitration provision requiring that RISO and Witt Company arbitrate their claims. A 2003 Dealer Agreement superseded and replaced the 1998 Dealer Agreement. Paragraph 8(h) of the 1998 Dealer Agreement and Paragraph 8(i) of the 2003 Dealer Agreement contain the following

identical arbitration provisions:

> Any controversy or claim arising out of or relating to this Agreement shall be determined exclusively by binding arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the American Arbitration Association utilizing three arbitrators.  The arbitrators shall award all reasonable attorney's fees and costs incurred in connection with the arbitration to the party the arbitrators determine substantially prevailed in the arbitration.

B. Witt Feb. 13, 2014 Decl., Ex. 1 at 6 (1998 Dealer Agreement); Ex. 2 at 7 (2003 Dealer

Agreement).

2.  2005 Dealer Agreement

The 2003 Dealer Agreement between the parties was replaced by a 2005 Dealer

Agreement which contained, in paragraph 8(l), an arbitration provision similar, but not identical,

to the one in the earlier agreements as follows:

> Any controversy or claim arising out of or relating to this Agreement shall be determined exclusively by binding arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the American Arbitration Association utilizing three arbitrators.  The arbitrators shall award all reasonable attorney's fees and costs, including fees of arbitration and expert fees, incurred in connection with the arbitration to the party the arbitrators determine substantially prevailed in the arbitration.  Consistent with paragraph 8(j) above, the arbitrators shall have no power to award, and the parties do not agree to arbitrate any claims seeking, punitive or exemplary damages (including treble or other multiple damages).

Paragraph 8(j) of the 2005 Dealer Agreement states that:

> Neither RISO nor Dealer shall be liable to the other for any punitive or exemplary damages of any sort (including treble or other multiple damages), and both expressly waive any right they might otherwise have to seek the same.  RISO will not under any circumstances be liable to Dealer or any End-user for lost profits or for any consequential or incidental damages, whatever the cause.

B. Witt Feb. 13, 2013 Decl., Ex. 3 at 8.

/ / /

11 - OPINION & ORDER

3. The FY 2008 Dealer Agreement

The most recently executed express agreement is the FY 2008 Dealer Agreement which was entered into by the parties on April 1, 2007.  Its arbitration provision, in paragraph 8(k), states:

> Any controversy or claim arising out of or relating to this Agreement shall be determined exclusively by binding arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the American Arbitration Association utilizing three arbitrators.  The arbitrators shall award all reasonable attorney's fees and costs, including fees of arbitration and expert fees, incurred in connection with the arbitration to the party the arbitrators determine substantially prevailed in the arbitration.  Consistent with paragraph 8(j) above, the arbitrators shall have no power to award, and the parties do not agree to arbitrate any claims seeking, punitive or exemplary damages (including treble or other multiple damages).  Notwithstanding the binding arbitration provision of this paragraph 8(k), but in no way affecting or diminishing the provisions of paragraph 8(j), RISO and Dealer shall have the right to bring an action in any court of competent jurisdiction for injunctive relief, repossession, replevin, sequestration, seizure, attachment, and/or any other prejudgment or provisional action or remedy.  The filing of any such action or remedy will not waive RISO's or Dealer's right to compel arbitration under this paragraph.

B. Witt Feb. 13, 2013 Decl., Ex. 4 at 9.  Paragraph 8(j) of the FY 2008 Dealer Agreement is identical to the same paragraph, and quoted above, in the 2003 Agreement.  Id.

B.  Effective Dates of Express Dealer Agreements

It appears that one written Dealer Agreement or another governed the parties' relationship through March 2010, with an additional ninety-day period in 2011.  The FY 2008 Dealer Agreement contained a termination provision which made that Agreement effective until it was replaced by a succeeding agreement, or ninety days after RISO offered to replace the Agreement with a succeeding agreement, or Witt Company notified RISO that it did not accept the terms of the succeeding agreement, or the Agreement was terminated in accordance with another

paragraph in the Agreement.  B. Witt Feb. 13, 2013 Decl., Ex. 4 at 5.  Because RISO offered to

replace the FY 2008 Dealer Agreement with a succeeding Dealer Agreement in December 2009

and Witt Company did not execute that succeeding agreement, the FY 2008 Dealer Agreement

expired ninety days later, sometime in March 2010.

The parties continued to do business and in March 2011, the parties agreed to reinstate

the terms of the FY 2008 Dealer Agreement for a period of ninety days following the execution

of an Asset Purchase and Sale Agreement ("the 2011 APA").  The FY 2008 Dealer Agreement

was resurrected as part of the 2011 APA so that the parties could attempt to negotiate terms and

conditions of a succeeding Dealer Agreement that would be acceptable to both parties.  Thus,

from April 1, 2011 to June 30, 2011, the FY 2008 Dealer Agreement controlled the parties'

relationship.  B. Witt Feb. 13, 2014 Decl., Ex. 6 at 19.[2]  From March 2010 until Witt Company

ceased being an authorized RISO dealer on May 31, 2013, the FY 2008 Dealer Agreement did

not expressly apply to the parties' relationship except for the ninety-day period ending on June

30, 2011 mentioned above.

II.    The Price Support Claims against Witt Company Arising <u>Before</u> the Expiration of the FY
       2008 Dealer Agreement

The Price Support claims are all based on the central allegation that Witt Company

submitted fraudulent invoices in connection with RISO's Price Support Program.  The Price

Support Program is an express provision in the FY 2008 Dealer Agreement.  B. Witt Feb. 13,

2014 Decl., Ex. 4 at 4 (paragraph 3(k) of FY 2008 Dealer Agreement).  The terms and conditions

of the Price Support Program are detailed there.  <u>Id.</u>  Witt Company argues that based on the

_____

[2] At oral argument, RISO's counsel clarified that this resurrected ninety-day period was
regarding Witt Company's territory in California and Arizona only.

plain language of paragraph 3(k) of the FY 2008 Dealer Agreement, it is clear that the Price

Support Program is offered to RISO dealers under RISO's Dealer Agreement and further, because

RISO authorized dealers purchase products pursuant to the terms and conditions of RISO's

Dealer Agreement and are offered price support under the Price Support program in connection

with such purchases, RISO's Price Support claims against Witt Company arise under the FY

2008 Dealer Agreement.  As a result, Witt Company contends, these claims are subject to the

arbitration provisions in the Dealer Agreements.[3]

In response to the motion, RISO agrees that "its Price Support-related claims for conduct

occurring prior to the expiration of the FY2008 Dealer Agreements (parts of Count I, II, III, IV,

V, VII, and VIII) arise out of and relate to the Dealer Agreements[.]"  RISO's Opp. Mem. at 8.

RISO agrees that these claims, or portions of claims, which it calls "Pre-Expiration Price Support

Claims," that are directed against Witt Company, but not to the individual Defendants, are claims

that could have been brought in arbitration under the arbitration clause of the various Dealer

Agreements.  Id.

RISO nevertheless opposes arbitration of these claims based on its contention that Witt

Company waived its right to arbitrate the claims.  This argument has several parts:  that Witt

Company was aware of the arbitration provisions when it filed the 2013 Antitrust Litigation, that

Witt Company acted inconsistently with the right to arbitration contained in the Dealer

_____

[3] Witt Company's argument about the applicability of the arbitration provision includes
the RICO claims.  Witt Company contends that because the RICO claims arise out of Witt
Company's conduct in connection with the Price Support Program under the Dealer Agreements,
such claims are also subject to the Dealer Agreements' arbitration provisions.  I address
arguments particular to the RICO claims below.

Agreements, and that arbitration of the Price Support claims would prejudice RISO.[4]

    A.  Law Regarding Waiver of Arbitration Provision

A party may waive its right to arbitrate claims under an arbitration agreement.  <u>United States v. Park Place Assocs., Ltd.</u>, 563 F.3d 907, 921 (9th Cir. 2009) ("[t]he right to arbitration, like any other contract right, can be waived").  However, "[w]aiver of a contractual right to arbitration is not favored and, therefore, any party arguing waiver of arbitration bears a heavy burden of proof."  <u>Richards v. Ernst & Young, LLP,</u> 744 F.3d 1072, 1074 (9th Cir. 2013) (internal quotation marks omitted).  A party "seeking to prove waiver of a right to arbitration must demonstrate: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts."  <u>Id.</u> (internal quotation marks omitted).

    B.  The Waiver Analysis

        1.  Knowledge of Existing Right to Compel Arbitration

Witt Company does not dispute that it had knowledge of the arbitration provisions in the Dealer Agreements when it filed the 2013 Antitrust Litigation.

        2.  Actions Inconsistent with Right to Arbitrate

RISO argues that Witt Company took actions inconsistent with the mandatory arbitration provisions in the Dealer Agreements by filing the 2013 Antitrust Litigation which, according to RISO, included claims necessarily encompassing the acts forming the foundation of RISO's current claims.  More specifically, RISO contends that Witt Company would not have been able

---

    [4] In the briefing, the parties disputed whether the Court is the proper tribunal to determine waiver.  At oral argument, however, RISO's counsel conceded that the Court decides whether the parties go to arbitration, obviating the need for me to resolve that issue.

to prove its allegations that RISO charged supracompetitive prices for its supply products without examining the Price Support provided by RISO.  Because this is the same Price Support that RISO contends Witt Company fraudulently obtained, RISO argues that the claims in the 2013 Antitrust Litigation and the instant case are similar enough for me to conclude that Witt Company acted inconsistently with the arbitration provision by bringing its antitrust and related claims in court rather than in an arbitration.

Generally, waiver requires prior litigation of the same claims, legally and factually.  E.g., Doctor's Assocs., Inc. v. Distajo, 107 F.3d 126, 133 (2d Cir. 1997) ("only prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate"; court concluded that prior suits to evict tenants did not waive right to arbitrate distinct and separate claim regarding validity of franchise agreement); see also MicroStrategy, Inc. v. Lauricia, 268 F.3d 244, 250 (4th Cir. 2001) (where a party's claims are distinct, both factually and legally, from claims filed in court in connection with prior litigation, the litigation surrounding such claims cannot support a finding that a party waived its right to arbitrate); REDF Organic Recovery, LLC v. Kafin, No. 12 Civ. 7973(JFK), 2012 WL 5844191, at *10-11 (S.D.N.Y. Nov. 19, 2012) (court rejected argument that the defendant waived its right to arbitrate based on the defendant's participation in prior litigation, including depositions, document production, summary judgment motions, and trial, because while both disputes concerned the parties' license agreement, the prior litigation involved whether the license agreement was valid and binding and the current litigation was about a breach of the agreement; accordingly, because that breach of contract claim had not yet been litigated, the plaintiff could not show that the defendant was attempting to relitigate an issue through arbitration);  Allied Sys. Co. v. Marinette

16 - OPINION & ORDER

Marine Corp., No. 03:99-cv-00368-ST, 1999 WL 632708, at *11-12 (D. Or. Aug. 20, 1999)

(although the claims and facts in the two cases were tangentially related, the claims in the prior

case involved contract formation with a party seeking rescission or reformation of the contract

while the claims in the current litigation involved a party's conduct in performing the contract).

I agree with Witt Company that the claims in the 2013 Antitrust Litigation are not similar

enough to the claims brought in the instant case to support a finding of inconsistent conduct by

Witt Company.  The claims in the 2013 Antitrust Litigation primarily asserted that RISO violated

federal antitrust laws by threatening to terminate Witt Company's authorized dealer status if Witt

Company did not agree to refrain from selling competing non-RISO products under the terms of

RISO's Dealer Agreement.  Witt Company also contended that the threat of termination breached

the parties' 2011 APA.  In contrast, the claims here are based on allegedly fraudulent conduct in

connection with the Price Support program.  None of the claims in the 2013 Antitrust Litigation

encompassed or related to Witt Company's alleged misconduct in connection with or use of the

Price Support Program.  Although whether RISO charged "supracompetitive prices" for its

supply products may have been one of many fact issues in the antitrust claims, that does not

make the antitrust claims in the 2013 Antitrust Litigation the same claims at issue in the present

case.  Instead, the Price Support Program evidence establishes only a tangential relationship

between the claims and facts in the two cases.

Both parties offer interpretations of the injunctive relief exception in the FY 2008 Dealer

Agreement's arbitration clause in support of their respective positions on waiver.  Witt Company

argues that because it brought claims for injunctive relief in the 2013 Antitrust Litigation and

aggressively pursued a preliminary injunction, it could not have arbitrated the claims it brought

17 - OPINION & ORDER

in the 2013 Antitrust Litigation given the injunctive relief exception.  As a result, it cannot be said to have acted inconsistently with the arbitration provision.  RISO argues that the exception for injunctive relief is limited and by its express terms does not refer to filing claims for damages in court, which Witt Company did in the 2013 Antitrust Litigation.  RISO argues that the last sentence of the injunctive relief exception "demonstrates by negative implication that the parties intended that waiver occurs for all matters pursued in court except actions for injunctive relief or remedy."  RISO's Opp. Mem. at 13 (emphasis and internal quotation marks omitted).  Witt Company responds that contrary to RISO's assertion, the arbitration provision does not expressly prohibit a party from seeking damages that are either incidental, or in addition, to a claim for injunctive relief and that the plain language does not compel a conclusion that a party automatically waives a right to arbitrate by seeking monetary damages to injunctive relief on its claims.

I need not resolve the parties' competing arguments regarding interpretation of the injunctive relief exception to the arbitration provision.  The issue before me is whether Witt Company's present demand for arbitration is inconsistent with its filing of the 2013 Antitrust Litigation.  The last sentence of the arbitration provision is ambiguous and does not plainly compel the interpretation advocated by RISO.  RISO has a high burden to show that Witt Company acted inconsistently.  The fact that there is a reasonable dispute about whether the FY 2008 Dealer Agreement and the 2011 APA permitted Witt Company to file its claims seeking both injunctive relief and damages in court means that RISO cannot meet its burden.  Given that Witt Company's interpretation of the agreement is plausible, then RISO cannot establish that Witt Company's conduct was inconsistent.  Because the claims in the 2013 Antitrust Litigation are not

the same as the claims here and the injunctive relief exception is ambiguous, Witt Company's conduct in the 2013 Antitrust Litigation is not inconsistent with its present request to compel arbitration.

### 3.  Prejudice to RISO

RISO argues that arbitration of the Price Support claims would prejudice RISO in three ways:  First, RISO argues that allowing Witt Company to arbitrate the claims would encourage forum shopping by condoning Witt Company's "picking and choosing when the Dealer Agreement applies."  RISO's Opp. Mem. at 16.  Second, RISO argues that it expended time, money, and effort to dispose of Witt Company's claims in the 2013 Antitrust Litigation, including $50,000 in fees to local counsel, and that if its forced to arbitrate the current claims in Boston, it will have incurred the expense, yet lose the benefit, of litigating in Portland.  Third, it argues that enforcing the arbitration provision is unfair because it allows Defendants to reap a benefit from the protections of arbitration, such as discovery and procedural enforcement limitations, on claims that would not otherwise have been in arbitration had they been RISO counterclaims in the 2013 Antitrust Litigation.

Sufficient prejudice requires a finding that the moving party's conduct "has substantially undermined the important public policy of favoring arbitration or substantially impaired the other side's ability to take advantage of the benefits and efficiencies of arbitration." Biernacki v. Serv. Corp. Int'l, 533 F. App'x 741, 742 (9th Cir. 2013) (internal quotation marks and brackets omitted) (discussing California law).  Prejudice typically refers to "inherent fairness - in terms of delay, expense, or damage to a party's legal position - that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." Doctor's Assocs., Inc., 107 F.3d at

134.  Additionally, courts do "not find prejudice where the party opposing arbitration shows only that it incurred court costs and legal expenses because merely participating in litigation, by itself, does not result in a waiver." Biernacki, 533 F. App'x at 742 (internal quotation marks and brackets omitted); see also PPG Indus., Inc. v. Webster Auto Parts, Inc., 128 F.3d 103, 107 (2d Cir. 1997) ("Incurring legal expenses inherent in litigation, without more, is insufficient evidence of prejudice to justify a finding of waiver").

I agree with Witt Company that RISO fails to demonstrate sufficient prejudice.  First, as to the forum shopping argument, without a finding that Witt Company's conduct in filing the 2013 Antitrust Litigation is inconsistent with its present demand to arbitrate, the fact that it chose one forum for the initial litigation and now wants to adjudicate dissimilar claims in a different forum is not forum shopping.

Second, as to litigation expenses, I understand RISO's point that but for Witt Company filing the 2013 Antitrust Litigation in court in Portland, RISO would not have expended $50,000 in fees for local Portland counsel.  Nonetheless, this is fairly characterized as litigation expenses that are not properly viewed as prejudicial.  Moreover, RISO does not dispute that the injunctive relief portions of the claims raised in the 2013 Antitrust Litigation were properly brought in this Court and thus, RISO would have incurred local counsel fees in any event.  Furthermore, RISO's alleged loss of the benefit of costs incurred in educating Portland local counsel if arbitration in Boston is allowed, is not sufficient prejudice.  Local counsel here can be consulted if an arbitration in Boston proceeds.  And, RISO's primary counsel is in St. Louis in any event.  It is reasonable to assume that the primary counsel, who actively litigated the 2013 Antitrust Litigation claims and who is actively litigating this case, will be involved in any arbitration of the

20 - OPINION & ORDER

current claims.  Moreover, the claims are dissimilar enough that any particular expertise acquired by local counsel during the 2013 Antitrust Litigation will likely be of limited value in the Price Support claims.

Third, RISO's argument about alleged prejudice because of the limitations in arbitration is without merit.  The arbitration provisions are in RISO Dealer Agreements.  RISO cannot seriously contend that the Dealer Agreements it generated and signed containing arbitration provisions with RISO's chosen forum for dispute resolution are somehow lacking.

RISO fails to establish the required prejudice to support its waiver argument.

In summary, I reject RISO's waiver argument because even though Witt Company knew of the arbitration provisions, it did not act inconsistently with the present motion to compel arbitration and RISO fails to establish it has been prejudiced by Witt Company's conduct.  All of the Price Support claims against Witt Company arising before March 2010 are subject to the arbitration provisions in the Dealer Agreements.

III.    The Price Support Claims Against Witt Company Arising <u>After</u> the Expiration of
        the FY 2008 Dealer Agreement

As explained above, the last express, written agreement between the parties was the FY 2008 Dealer Agreement which terminated in March 2010 and then was resurrected for a ninety-day period from April 1, 2011 to June 30, 2011 under the terms of the parties' 2011 APA.  Witt Company argues that although there was no express arbitration provision that controlled the parties' relationship between March 2010 and April 1, 2011, and then after June 30, 2011, the claims RISO brings against it that are based on conduct occurring after the termination of the FY 2008 Dealer Agreement are nonetheless subject to the arbitration provision in the FY 2008

Dealer Agreement.

The thrust of Witt Company's argument is that there is a general presumption that a contract's arbitration provision survives the termination of the contract itself as long as the dispute has its source in the contract and involves matters arising out of the relationship governed by the contract. Witt Company argues that there was nothing in the arbitration provision of the FY 2008 Dealer Agreement that expresses RISO's intent to limit the application of the arbitration provision to the term of the Dealer Agreement itself, and because all of RISO's claims arising out of Witt Company's post-termination conduct are disputes arising out of the relationship governed by the contract, the post-termination claims are arbitrable. Finally, Witt Company argues that the evidence firmly establishes that RISO believed the FY 2008 Dealer Agreement continued to apply to the parties' relationship after the agreement expired and thus, the arbitration provision should apply to Witt Company's conduct during that time.

In response, RISO makes several arguments as to why Witt Company cannot compel arbitration of the post-termination claims, including that Witt Company is judicially estopped from asserting that the FY 2008 Dealer Agreement controlled the parties' relationship in the post-FY 2008 Dealer Agreement time period. RISO also makes a separate equitable estoppel argument. I address the estoppel arguments first.

A. Judicial Estoppel

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001). The doctrine is not limited to assertions of fact and it is not limited to assertions made or

22 - OPINION & ORDER

positions taken in the same litigation but may be invoked to bar litigants from making

incompatible statements in two different cases.  See id. at 782-83; see also Helfand v. Gerson,

105 F.3d 530, 535 (9th Cir. 1997) (judicial estoppel applies to a party's stated position regardless

of whether it is an expression of intention, a statement of fact, or a legal assertion).

The court should consider at least three factors in determining whether to apply the

doctrine:  (1) whether a party's later position is clearly inconsistent with its earlier position; (2)

"whether the party has succeeded in persuading a court to accept that party's earlier position, so

that judicial acceptance of an inconsistent position in a later proceeding would create the

perception that either the first or second court was misled"; and (3) "whether the party seeking to

assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on

the opposing party if not estopped."  New Hampshire v. Maine, 532 U.S. 742, 750 (2001)

(internal quotation marks omitted).  As to the second factor, "[a]bsent success in a prior

proceeding, a party's later inconsistent position creates no risk of inconsistent determinations."

Id. (internal quotation marks omitted).

1.  Inconsistent Positions

RISO argues that judicial estoppel bars Witt Company from benefitting from what RISO

calls Witt Company's inconsistent positions with regard to the FY 2008 Dealer Agreement.

RISO contends that Witt Company took the position in the 2013 Antitrust Litigation that it was

not subject to the FY 2008 Dealer Agreement, a position clearly inconsistent with Witt

Company's current position that the 2008 FY Dealer Agreement requires arbitration of RISO's

claims.

Witt Company contends that its positions have not been inconsistent.  I agree.  In the

23 - OPINION & ORDER

2013 Antitrust Litigation, Witt Company alleged that it was not "currently a party to any formal Dealer Agreement with RISO[.]"  2013 Antitrust Litig., Compl. at ¶ 7.   It alleged also that the FY 2008 Dealer Agreement "ceased to be become effective in March 2010," and that "Witt Company ha[d] not been a party to any Dealer Agreement with RISO since the termination of the [FY 2008] Dealer Agreement in March 2010, other than when the [FY 2008] Dealer Agreement was reinstated for a 90 day period following the closing of the [2011 APA]." Id. at ¶ 9.  Witt Company also asserted that "[d]espite the absence of a formalized Dealer Agreement," it "continued to be an authorized dealer." Id.; see also id. at ¶ 7 (alleging that as of the time the Complaint was filed in January 2013, Witt Company continued to be an authorized dealer).

Witt Company never took the position that it was not subject to the arbitration provision of the FY 2008 Dealer Agreement, or that the arbitration provision did not survive termination of the FY 2008 Dealer Agreement.  In the 2013 Antitrust Litigation, Witt Company contended that the formal FY 2008 Dealer Agreement expired in March 2010 (with the exception of the ninety-day period in 2011), but that nonetheless, the parties continued their relationship with RISO treating Witt Company as an authorized dealer until May 31, 2013.  Witt Company did not expressly allege in the Complaint in the 2013 Antitrust Litigation that the terms of the FY 2008 Dealer Agreement continued to apply after its termination.  However, its allegations that (1) the relationship between the parties continued after the termination of that agreement, and (2) under that relationship RISO treated Witt Company as an authorized dealer, indicate its belief that the terms of the FY 2008 Dealer Agreement applied post-termination.

In the present litigation, Witt Company asserts that the "most recent formalized Dealer Agreement entered into by RISO and Witt Company [was] the 2008 Dealer Agreement," and that

24 - OPINION & ORDER

the "2008 Dealer Agreement automatically terminated in March 2010," other than when it was reinstated for the ninety-day period in 2011 following execution of the parties' 2011 APA.  Defs.' Mem. at 5, 6.  Witt Company consistently argues in the instant case that "[d]espite the absence of a formalized, executed Dealer Agreement, RISO continued to treat Witt Company as an authorized dealer and supply it with RISO products, and Witt Company continued to operate as a RISO authorized dealer."  Id. at 7.  And, Witt Company contends that although "the most recent formalized Dealer Agreement between RISO and Witt Company, the 2008 Dealer Agreement, was terminated[,]" RISO's post-termination claims are subject to arbitration because "all of Witt Company's alleged post-termination conduct still arises out of and is related to the parties' relationship governed by the 2008 Dealer Agreement."  Id. at 25, 26.

As can be seen, in both the 2013 Antitrust Litigation and the instant case, Witt Company's position is that the FY 2008 Dealer Agreement expired but that the parties remained in a relationship under which Witt Company remained an authorized dealer.  Accordingly, the allegations in the 2013 Antitrust Litigation are not inconsistent with the allegations in the present case.

### 2.  Judicial Acceptance of Alleged Earlier Inconsistent Position

RISO argues that Witt Company successfully persuaded me in the 2013 Antitrust Litigation that there was no Dealer Agreement in effect.  As a result, RISO contends that the second prong of the judicial estoppel analysis is met.  In my June 7, 2013 Opinion granting RISO's motion to dismiss the claims in the 2013 Antitrust Litigation, I addressed whether the antitrust claim was barred by the four-year statute of limitations:

> To the extent the claim is based on the actual enforcement of paragraph 3

of the [FY 2008] Dealer Agreement, I agree with Defendant that such a claim accrued on April 1, 2007, the effective date of that agreement. The Complaint alleges that the [FY 2008] Dealer Agreement expired in March 2010 (other than its brief ninety-day resurrection in 2011 as part of the 2011 APA). The 2012 Dealer Agreement has never been executed. There is, therefore, no operative express agreement under which Defendant is allegedly enforcing the illegal provision in paragraph 3(a). Morever, Plaintiff alleges in the Complaint that although there is no express Dealer Agreement in place, its status as an authorized dealer has continued. Plaintiff does not allege that Defendant has continued to enforce paragraph 3(a) during this time.

        Any enforcement of the allegedly illegal tying provision in paragraph 3(a) began with the 2007 Dealer Agreement. Accordingly, any antitrust cause of action based on the current enforcement of paragraph 3(a) accrued with the effective date of the 2007 Dealer Agreement or April 1, 2007. Because this claim was filed more than four years after that date, it is time barred. . . . .

        Additionally, although continuing violations may restart the antitrust statute of limitations, there must be a new and independent act that is not merely a reaffirmation of a previous act, and it must inflict new and accumulating injury on the plaintiff. Here, any sales of digital duplicators and supplies pursuant to paragraph 3(a) of the [FY 2008] Dealer Agreement and occurring during the limitations period do not amount to continuing violations because performance of an alleged illegal contractual tie-in provision does not satisfy the continuing violation requirements.

2013 Antitrust Litig., June 7, 2013 Op. at 9-10.

This discussion reveals that I initially applied the statute of limitations to the claim with the assumption that the claim was based on the actual enforcement of the alleged illegal tying provision in paragraph 3(a) of the FY 2008 Dealer Agreement. I suggested that the allegations in the Complaint did not establish that the illegal tying provision had actually been enforced past the termination of the FY 2008 Dealer Agreement in March 2010: "The 2012 Dealer Agreement has never been executed. There is, therefore, no operative express agreement under which Defendant is allegedly enforcing the illegal provision." Id. at 9.

I then addressed the argument that while there may have been no express agreement applicable to the post-termination time period, Witt Company nonetheless asserted that its status

as an authorized dealer continued:  "Plaintiff [Witt Company] alleges . . . that although there is

no express Dealer Agreement in place, its status as an authorized dealer has continued."  Id.  I

expressed concern over the lack of an allegation by Witt Company that RISO had continued to

enforce the illegal tying provision during that time.  Thus, at that point in the Opinion, I had

made some assumptions about the nature of the claim (being based on the actual enforcement of

the illegal tying provision) and then noted that the allegations in the Complaint did not support

that RISO was actually currently enforcing the tying provision.  I did not adopt any position by

Witt Company that the FY 2008 Dealer Agreement did not continue to generally govern the

parties' relationship post-termination.

      This is made clear by what I did next:  I assumed there was actual, current enforcement of

the illegal tying provision contained in the FY 2008 Dealer Agreement.  Id. at 9-10.  But, even

with that assumption, I indicated that any current enforcement actually began with the inception

of the FY 2008 Dealer Agreement on April 1, 2007, and thus, was time barred.  Id.  Again, I did

not adopt a position by Witt Company that the FY 2008 Dealer Agreement did not govern the

parties' post-termination relationship.  In fact, my assumptions are consistent with the position

Witt Company now asserts:  that while the express, written FY 2008 Dealer Agreement had

terminated, the terms of the FY 2008 Dealer Agreement, including the alleged illegal tying

provision, continued into the current time period.  Finally, I addressed the issue of continuing

violations and again, I assumed the continued validity, post-termination, of the FY 2008 Dealer

Agreement.  Id. at 10 ("any sales of digital duplications and supplies pursuant to paragraph 3(a)

of the [FY 2008] Dealer Agreement and occurring during the limitations period do not amount to

continuing violations . . . .").

27 - OPINION & ORDER

In my June 7, 2013 Opinion, I concluded that the illegal tying claim was time barred to the extent it was based on an argument that RISO was enforcing the tying arrangement under paragraph 3(a). I also discussed an alternative version of the tying claim where the tying claim was actually based on the threat to end Witt Company's status as an authorized dealer as a consequence for Plaintiff's refusal to sign the proposed 2012 Dealer Agreement. The premise of this alternative claim was that it was <u>not</u> based on the parties' relationship created by the FY 2008 Dealer Agreement but rather, was a "unilateral conduct" tying claim based on a September 2012 attempt by RISO to coerce Witt Company into buying only RISO supplies in violation of the antitrust laws. <u>Id.</u> at 11-12. In the context of discussing that interpretation of the claim, I noted that it was timely, but then I dismissed it for failure to state a claim. I stated that absent an express tying contract, the threat of termination was unilateral conduct not subject to the antitrust laws unless other buyers had agreed to the tying arrangement under threat of termination. <u>Id.</u> at 18-19. Because there were no such allegations in the Complaint, Witt Company failed to state a unilateral conduct claim. <u>Id.</u>

In support of its judicial estoppel argument, RISO points to a statement in the June 7, 2013 Opinion in the 2013 Antitrust Litigation that without an operative agreement under which the alleged illegal tying provision in paragraph 3(a) of the Dealer Agreement was being enforced, there was no actionable tying contract. <u>Id.</u> at 19. Although I made that statement, I did not adopt a position suggested by Witt Company that the terms of the FY 2008 Dealer Agreement did not apply. The discussion at that point was based on an interpretation of the claim that considered only whether the September 2012 threat of termination was in violation of the antitrust laws and thus, I was not adopting a particular position of Witt Company's.

28 - OPINION & ORDER

I discussed various interpretations of the claim in the June 7, 2013 Opinion because it was never entirely clear whether Witt Company was alleging that there was a current agreement (and if so, what agreement exactly), or that there was no agreement.  Because the allegations in the Complaint in the 2013 Antitrust Litigation were unclear, I discussed the various permutations of the antitrust claim, making assumptions along the way.  I never actually adopted a particular position asserted by Witt Company.  As a result, RISO cannot successfully establish that accepting Witt Company's current position would create the perception that I was misled in the earlier litigation or in the current litigation.

### 3.  Unfair Advantage/Unfair Detriment

The third factor in analyzing a judicial estoppel argument is to consider whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  New Hampshire, 532 U.S. at 750.  Even if Witt Company is asserting an inconsistent position, which it is not, there is no unfair advantage to Witt Company or unfair detriment to RISO.

RISO argues that Witt Company's earlier disclaimer of being subject to the FY 2008 Dealer Agreement allowed Witt Company to bring the antitrust claims in the 2013 Antitrust Litigation.  It enjoyed expedited discovery, sought a preliminary injunction, and claimed treble damages, none of which RISO argues would have been available under the FY 2008 Dealer Agreement.  But, RISO ignores that the arbitration provision would have excluded the injunctive relief claims and thus, the Agreement permitted Witt Company to bring those claims in this Court along with the expedited discovery it engaged in as part of its preliminary injunction request.

29 - OPINION & ORDER

RISO also maintains that it will suffer an unfair detriment by being forced to bring its claims in arbitration where it loses the right to appeal, the right to seek punitive damages, and the right to a jury trial. It states that it will be restricted to limited discovery. But, RISO agreed to arbitration, and I reject the argument that RISO's contractually chosen forum is detrimental to its rights.

RISO fails to show that Witt Company has taken inconsistent positions, fails to show that I actually relied on any assertion by Witt Company that the FY 2008 Dealer Agreement did not govern the parties' relationship after its termination, and fails to show that Witt Company is unfairly advantaged and RISO is unfairly disadvantaged by Witt Company's assertion that the arbitration provision of the FY 2008 Dealer Agreement applies to post-termination conduct. Witt Company is not judicially estopped from asserting that the arbitration provision of the FY 2008 Dealer Agreement applies to the Price Support claims based on conduct arising after that agreement's termination.

C.  Equitable Estoppel

RISO makes a separate argument based on "equitable estoppel," asserting that in addition to previously representing to this Court that the terms of the FY 2008 Dealer Agreement did not govern the parties' post-termination relationship, Witt Company allegedly represented in communications to RISO that it was not bound by the terms of any Dealer Agreement after the FY 2008 Dealer Agreement expired. RISO also argues that it is inconsistent for Witt Company to attempt to compel arbitration of RISO's claims which RISO characterizes as a natural extension of Witt Company's claims against RISO and which would have been counterclaims in the 2013 Antitrust Litigation.

As to that last point, RISO could have answered the Complaint in the 2013 Antitrust

Litigation and raised the claims it brings here as counterclaims there.  But, it sought dismissal of

the claims instead.  Its argument that Witt Company somehow deprived it of the opportunity to

assert counterclaims is unpersuasive.  And, I reject RISO's argument that its claims are a "natural

extension" of the claims Witt Company previously brought in the 2013 Antitrust Litigation.  For

the reasons previously explained, they are not related either legally or factually.

As to any representations Witt Company may have made to RISO regarding the post-

termination application of the terms of the FY 2008 Dealer Agreement, for the reasons explained

more thoroughly below, I am not persuaded that the statements Witt Company made are

inconsistent with the position it takes now.  Thus, I reject RISO's equitable estoppel argument.

D.  Application of the Arbitration Provision to Post-Expiration Conduct

There is no dispute that the parties continued their relationship after the expiration of the

FY 2008 Dealer Agreement in March 2010.  As stated above, Witt Company remained an

authorized dealer until May 31, 2013.  The issue is whether the arbitration provision contained in

the express, written FY 2008 Dealer Agreement, applies to allegedly fraudulent conduct by Witt

Company after March 2010.  I agree with Witt Company that it does.

> Under the federal common law of arbitrability, an arbitration provision in
> a contract is presumed to survive the expiration of that contract unless there is
> some express or implied evidence that the parties intend to override this
> presumption:  "In short, where the dispute is over a provision of the expired
> agreement, the presumptions favoring arbitrability must be negated expressly or
> by clear implication." Nolde Bros., Inc. v. Local No. 358, Bakery &
> Confectionery Workers Union, 430 U.S. 243, 255, 97 S. Ct. 1067, 51 L. Ed.2d
> 300 (1977).  Thus, when a dispute arises under an expired contract that contained
> a broad arbitration provision, courts must presume that the parties intended to
> arbitrate their dispute. This is so even if the facts of the dispute occurred after the
> contract expired. See id. (holding that claims for severance pay by workers who

were discharged after their collective bargaining agreement expired were subject
to the continuing force of the prior arbitration clause). The presumption in favor
of continuing arbitrability, however, disappears in either of two situations:  first, if
the parties express or clearly imply an intent to repudiate post-expiration
arbitrability, and second, if the dispute cannot be said to arise under the previous
contract. See id. at 254–55, 97 S.Ct. 1067[.]

Riley Mfg. Co. v. Anchor Glass Container Corp., 157 F.3d 775, 781 (10th Cir. 1998).  The law

regarding whether an arbitration provision survives the expiration of the contract has its roots in

labor law decisions interpreting collective bargaining agreements.  E.g., Litton Fin. Printing Div.,

Inc. v. NLRB, 501 U.S. 190, 206 (1991); Nolde, 430 U.S. 243; see also Op. Engs. Local Un. No.

3 v. Newmont Min. Corp., 476 F.3d 690, 692 (9th Cir. 2007) (noting that the expiration of the

parties' collective bargaining agreement did not automatically extinguish its duty to arbitrate

grievances arising under the agreement and that the dispute between the company and the union

"arise[s] under the contract and therefore subjects the parties to arbitration, if (1) it involves facts

and occurrences that arose before expiration, (2) an action taken after expiration infringes a right

that accrued or vested under the agreement, or (3) under normal principles of contract

interpretation, the disputed contractual right survives expiration of the remainder of the

agreement") (internal quotation marks omitted) (relying on Nolde and Litton).

        However, cases make clear that the principles apply outside of the labor law context and

to commercial agreements.  E.g., Pearson v. Skylark Co., Ltd., No. 03:00–cv–01426–HA, 2000

WL 33201876, at *2 (D. Or. Dec. 21, 2000) (in a commercial context, citing Riley for the

proposition that an arbitration provision in a contract is presumed to survive the expiration of that

contract unless there is some express or implied evidence that the parties intend to override this

presumption); see also Wolff v. Westwood Mgmt, LLC, 558 F.3d 517, 520 (D.C. Cir. 2009)

(applying Nolde and Litton in the context of a commercial contract arbitration provision and

concluding that claims that arose from the agreement which had terminated were subject to

arbitration); Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l., Ltd., 1 F.3d 639, 643-44

(7th Cir. 1993) (finding Nolde's reasoning persuasive and applying Nolde in context of

commercial contract; rejecting argument that arbitration provision did not apply post-expiration

of the contract when parties did not explicitly limit the duty to arbitrate to the term of the

agreement itself, the parties used language that evinced an intent to commit to arbitration any

dispute connected with the contract irrespective of when it occurred, and when the dispute arose

on the "heels" of the agreement).

Based on the applicable law, Witt Company notes first that there is no explicit language

in the FY 2008 Dealer Agreement arbitration provision that limits the application of that

provision to the term of the FY 2008 Dealer Agreement itself.  Witt Company argues that the

post-termination Price Support claims arise under the FY 2008 Dealer Agreement based on

Paragraph 5(e)(i) of the FY 2008 Dealer Agreement which allows dealers to continue to purchase

from RISO certain parts and supplies after the termination of the agreement.  B. Witt Feb. 13,

2014 Decl., Ex. 4 at 6.  Witt Company maintains that after the termination of the FY 2008 Dealer

Agreement, it continued, and still continues, to purchase parts and supplies from RISO pursuant

to Paragraph 5(e)(i) of the FY 2008 Dealer Agreement.  Moreover, William Witt states in his

Declaration that RISO continued to provide Witt Company with price support under the Price

Support Program for Witt Company's post-termination purchase of parts and supplies until RISO

terminated Witt Company's authorized dealer status on May 31, 2013.  B. Witt Feb. 13, 2014

Decl. at ¶ 11.  Witt Company argues that because its post-termination purchases are governed by

Paragraph 5(e)(i) of the FY 2008 Dealer Agreement and RISO's post-termination Price Support

claims arise from Price Support given to Witt Company for such post-termination purchases, the

FY 2008 Dealer Agreement's arbitration provision clearly covers RISO's claims arising out of

Witt Company's post-termination conduct.

I agree with RISO that Paragraph 5(e)(i) applies only to <u>former</u> authorized dealers. That

provision recognizes that dealers whose agreements have terminated must still service

previously-purchased machines by buying parts and supplies from RISO. As long as Witt

Company remained an authorized dealer, Paragraph 5(e)(i) was inapplicable. RISO's post-

expiration provision of machines was not governed by Paragraph 5(e)(i) because machine

purchases are limited to authorized dealers. Paragraph 5(e)(i) applies only to purchases of parts

and supplies by former dealers, not current ones. Nonetheless, I agree with Witt Company that

the parties' relationship post-expiration of the FY 2008 Dealer Agreement, including the post-

expiration purchases by Witt Company and the post-expiration Price Support granted by RISO,

was governed by an implied-in-fact contract and thus, the arbitration provision applies to this

conduct.

Whether a contract exists is a question of law. <u>DCIPA, LLC v. Lucile Slater Packard</u>

<u>Children's Hosp. at Stanford</u>, 868 F. Supp. 2d 1042, 1053 (D. Or. 2011) (citing <u>Ken Hood</u>

<u>Constr. v. Pacific Coast Constr.</u>, 201 Or. App. 568, 577, 120 P.3d 6 (2005), <u>adh'd to as modified</u>

<u>on recons.</u>, 203 Or. App. 768, 126 P.3d 1254 (2006)). An "implied-in-fact" contract is inferred

from the parties' conduct. <u>Id.</u> (citing <u>Staley v. Taylor</u>, 165 Or. App. 256, 262, 994 P.2d 1220

(2000) ("implied-in-fact contracts arise because an accepted course of conduct would permit a

reasonable juror to find that the parties understood that their acts were sufficient to manifest an

34 - OPINION & ORDER

agreement")).

Both RISO and Witt Company agree that "[a]s a general rule, an implied agreement arises when a written contract expires by its terms and the parties continue to perform as before." Cloverdale Equip. Co. v. Manitowoc Eng. Co., 964 F. Supp. 1152, 1162 (E.D. Mich. 1997) (where parties continued doing business as usual following the expiration of the written agreement, "an implied in fact agreement was created, which incorporated the same material terms"); see also Andrews v. Sotheby Int'l Realty, Inc., No. 12 CIV. 8824(RA), 2014 WL 626968, at *8 (S.D.N.Y. Feb. 18, 2014) (where the parties' conduct after expiration of a written contract is in accordance with the terms of the written contract, this establishes a "contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract") (internal quotation marks omitted).

If the facts establish the existence of an implied-in-fact contract following the expiration of an express written agreement with an arbitration provision, the arbitration provision, being one of the "same terms and conditions" of the expired written contract, is considered a provision of the implied-in-fact contract. In a 2008 New Hampshire case, the defendant manufacturer granted the plaintiff distributor the right to sell its products under a distribution agreement which contained a broad arbitration clause applicable to all disputes and claims arising under or relating to the agreement. C.B. Sullivan Co,, Inc. v. Graham Webb Int'l, Inc., No. 07–cv–170–SM, 2008 WL 249060, at *1 (D.N.H. Jan. 28, 2008). Although the distribution agreement expired, the parties "continued their relationship under the same terms and conditions as had governed that relationship when the [agreement] was still in force. Id. Several years later, when the manufacturer told the distributor it was going to terminate the distribution relationship, the

35 - OPINION & ORDER

distributor sued. Id. at *2. The manufacturer moved to dismiss based on the arbitration provision; the distributor argued that the arbitration provision expired with the distribution agreement. Id. The court rejected the distributor's argument, stating that "[a]lthough the parties allowed the [Distribution Agreement] to lapse without further extension, they continued to conduct their business relationship in accordance with the terms and conditions set forth in the [Distribution Agreement.]" Id. at *4. Thus, "by their ongoing course of dealings, the parties plainly manifested an intention to have their conduct governed by the terms of the [Distribution Agreement] - including its arbitration provision." Id.

After the FY 2008 Dealer Agreement expired, RISO clearly continued to believe and assert that the parties' ongoing relationship was governed by the terms and conditions of the FY 2008 Dealer Agreement. For example, in an August 2012 email, Witt Company's then legal counsel asked Kathryn Hawkes, RISO's in-house corporate counsel, whether the "FY 2008 dealer agreement governs the parties [sic] relationship today?" to which Hawkes responded that although she thought a prior email made it clear, "in the spirit of cooperation and to remove any doubt, the answer is yes, those terms govern." Fendall Decl., Ex. 3 at 4. Outside counsel for RISO repeated this belief in a December 2012 email to Witt Company's current counsel: "RISO believes that the parties' relationship continues to be governed by the terms and conditions of the FY2008 Dealer Agreements." Fendall Decl., Ex. 4 at 2.

And, in both the 2013 Antitrust Litigation and the instant litigation, RISO has continued to make that assertion. E.g., RISO's Opp. Mem. at 8 n.11 ("RISO has consistently taken the position that the post-expiration relationship was generally governed by terms of the FY2008 Dealer Agreement as an 'implied-in-fact' arrangement"); Id. at 19 ("it has been RISO's position

throughout its dispute with Witt Company that generally the terms of the FY2008 Dealer

Agreement continued to control the parties' relationship").

       RISO contends that in contrast, Witt Company disavowed the continuing application of

the FY 2008 Dealer Agreement and thus, the record establishes Witt Company never intended

that the FY 2008 Dealer Agreement, or the arbitration provision, remained effective after its

termination.  RISO relies on correspondence from William Witt in 2012 and early 2013.  In

particular RISO notes that in August 2012, William Witt wrote to RISO and expressly noted that

"there is presently no written Dealer Agreement in place between our firms."  Igarashi Decl. at ¶

10, Ex. 3.  In December 2012, William Witt wrote to RISO asking whether RISO was allowing

other dealers to seek "competitive" (meaning non-RISO) equipment and supplies even though

they had current Dealer Agreements in place, and if that were the case, "why is Witt Company,

which has not signed a current Riso Dealer Agreement, being treated differently?"  Id. at ¶ 12;

Ex. 4.  In a December 7, 2012 memorandum, William Witt advised RISO that he would not be

"signing the totally 1 sided agreement you have tried to force on us."  Id. at ¶ 13, Ex. 5.  And in

December 2012, William Witt signed three FY 2012 Dealer Agreements but struck through the

provisions applicable to duplicators.  Id. at ¶ 14, Ex. 6.  In the cover letter accompanying these

FY 2012 Dealer Agreements that William Witt amended and sent back to RISO, William Witt

stated that

>      Witt Company has amended Schedule A on all three Agreements to delete
> all products except RISO Comcolor Products.  Witt Company will fully comply
> with all the provisions of the Agreement (as amended) for those products.
>
>      Witt Company fully expects Riso to continue to recognize it as an
> authorized Dealer for its Digital Duplicator products in all its existing territories
> under the terms we have operated during the past several years.

37 - OPINION & ORDER

Id.

     In January 2013, Witt Company, through its counsel, advised RISO that Witt Company would sign a Dealer Agreement identical to what RISO offered, but with thirteen proposed changes.  Id. at ¶ 16, Ex. 7.  Two of the changes dealt with "anti-fraud" provisions in the proposed agreement.  Witt Company proposed to delete Paragraph 8(l)(iii) which was part of the arbitration provision which allowed RISO to bring an action in court for damages as a result of fraud.  Id.  Witt Company also proposed that RISO's right to inspect Witt Company's books regarding support programs would commence on April 1, 2013 but only to matters taking place after March 31, 2013.  Id.  Finally, RISO goes back to correspondence from William Witt in October 2011 in which Witt Company returned a proposed Dealer Agreement but with changes made, one of which was to delete the entire arbitration provision.  Id. at ¶¶ 6, 7, Ex. 1.

     I disagree with RISO's characterization of these communications and find that they do not clearly exhibit a denial by Witt Company that it was subject to the terms of the FY 2008 Dealer Agreement.  William Witt's August 2012 statement that there was no present written agreement is a correct statement of the status of the relationship at that time - there was no present written agreement.  His December 2012 statement questioning if Witt Company was being treated differently and noting that it did not have a current signed agreement was an accurate description of the relationship.  Neither of these statements is inconsistent with an assertion that the parties' continuing business created a post-expiration implied-in-fact agreement with the same terms and conditions imposed by the written FY 2008 Dealer Agreement.

     I read William Witt's January 2013 comment that he "fully expect[ed] Riso to continue to recognize it as an authorized Dealer for its Digital Duplicator products in all its existing

38 - OPINION & ORDER

territories under the terms we have operated during the past several years" as a statement consistent with a belief that the FY 2008 Dealer Agreement continued to apply to the parties' relationship after its termination, at least as to duplicators.  And, as to William Witt's proposed changes in January 2013 in which he wanted to strike the paragraph allowing RISO to file suit in court if it were bringing fraud claims for damages, and in which he wanted RISO's ability to view support documents to begin only after April 1, 2013, I fail to see how Witt Company's negotiating over a contract which would govern the relationship going forward is inconsistent with the belief that the then-current relationship continued to be governed by the FY 2008 Dealer Agreement.

Finally, I agree with Witt Company that its objection to the arbitration provision in a proposed new Dealer Agreement is not relevant to whether the FY 2008 Dealer Agreement continued to govern the parties' course of dealing post-termination.  And, even if such objections were relevant, Witt Company notes that while William Witt initially objected to the inclusion of an arbitration provision in a proposed new Dealer Agreement, he agreed to the inclusion of an arbitration provision in later negotiations over the new proposed Dealer Agreement subject to certain revisions.  And the arbitration provision to which Witt Company agreed during the negotiations that broke down shortly before the 2013 Antitrust Litigation commenced was almost identical to the arbitration provision in the FY 2008 Dealer Agreement except for a change in locale from Boston to Chicago.  Igarashi Decl. Ex. 6 at 25; Ex. 7 at 1.  I agree with Witt Company that the initial objection to the inclusion of any arbitration provision did not persist into the negotiations over a new Dealer Agreement and cannot be viewed as an expression of any intent by Witt Company to disavow the continuing applicability of the terms of the FY 2008

39 - OPINION & ORDER

Dealer Agreement during the negotiations over a new Dealer Agreement.

RISO and Witt Company continued to conduct business after the FY 2008 Dealer Agreement expired, uninterrupted and under the same terms and conditions of the FY 2008 Dealer Agreement, including buying duplicators as well as other supplies and parts, and offering and giving Price Support, until RISO terminated Witt Company's status as an authorized dealer effective May 31, 2013.  The claims in this case, which challenge Witt Company's conduct as early as 2002, or earlier, concern conduct which was governed by an express written Dealer Agreement.  The only conduct not subject to an express written Dealer Agreement is conduct occurring after March 2010 (except for the period April 1 to June 30, 2011).  Thus, the bulk of the allegations focus on conduct governed by an express agreement.  The nature of the challenged conduct in the Price Support claims that occurred post-March 2010 is the same conduct that continued after that date.  Nothing about the parties' relationship changed at all.

The evidence in the current record shows that the parties manifested their assent to continue to abide by the terms and conditions in the FY 2008 Dealer Agreement after its termination.  While Witt Company attempted to make certain changes to proposed agreements addressing the relationship going forward, the conduct of the parties during that time establishes that all of the terms of the FY 2008 Dealer Agreement, including its arbitration provision, continued to apply.  For the reasons explained above, I reject RISO's argument that Witt Company's post-termination conduct establishes that Witt Company did not intend to have its conduct governed by the FY 2008 Dealer Agreement.  Thus, while the cases indicate that the presumption that the parties intended to create an implied-in-fact contract by continuing conduct after the expiration of an express written contract can be rebutted by evidence that the parties did

40 - OPINION & ORDER

not intend to carry over certain terms of the expired contract, e.g., Webb Candy, Inc., 2010 WL 2301461, at *8-10, RISO fails show that Witt Company's conduct suggests that it did not intend the FY 2008 Dealer Agreement to govern the parties' relationship during the post-termination period while the parties were attempting to negotiate a new contract.

RISO argues that even if there is an implied-in-fact agreement governing the parties' relationship post-termination, any conduct by Witt Company during that post-termination time period did not arise from a written agreement and under 9 U.S.C. §§ 2, 3, a stay is required only where an issue is referable to arbitration under an agreement in writing. But, the implied-in-fact agreement created by the parties' conduct post-termination was not a new contract. Instead, it was an implied-in-fact agreement to extend the FY 2008 Dealer Agreement. Thus, the arbitration provision was in writing; only the agreement to extend is being implied.

The arbitration provision in the FY 2008 Dealer Agreement applies to the post-termination Price Support claims against Witt Company.

IV.  The Claims Against Individual Defendants William Witt and Edner

Four claims are brought against William Witt and Edner: the fraud-related claims in Count I; the Massachusetts Consumer Protection Act claim in Count II; and the two RICO claims in Counts VII and VIII. RISO does not contest that if otherwise applicable, the arbitration provision applies to the fraud and consumer protection claims in Counts I and II brought against the individual Defendants.

Under ordinary contract and agency principles, William Witt and Edner may compel arbitration of RISO's claims in Counts I and II against them even though they are non-signatories to the relevant Dealer Agreements. In Letizia v. Prudential Bache Securities, Inc., 802 F.2d

41 - OPINION & ORDER

1185, 1187 (9th Cir. 1986), the court adopted what it described as the "majority view" and held that "nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles." The arbitration clauses are broad and RISO alleges that William Witt and Edner engaged in wrongful acts in their capacities as officers or agents of Witt Company. E.g., First Am. Compl. at ¶¶ 11, 12 (alleging that William Witt and Edner were actively involved in the operations and management of Witt Company, including the unlawful conduct described in the First Amended Complaint); ¶ 71 (alleging that William Witt was the authorized contact for Witt Company's Price Support applications and signed those applications as the "Authorized Dealer/Branch Contract"); ¶ 72 (alleging that Edner was the Witt Company employee responsible for preparing and submitting Price Support applications and credit request documentation to RISO). It is clear that RISO alleges that William Witt and Edner committed allegedly wrongful acts related to their running of Witt Company in their capacities as officers or agents of Witt Company. Thus, as to Count I (the fraud claim) and Count II (the Massachusetts statutory claim), the claims against William Witt and Edner are subject to arbitration.

As to the RICO claims, RISO argues that because of the unique structure of a RICO claim, the court cannot view William Witt and Edner as agents of Witt Company. Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c) (emphasis added). A RICO claim under section 1962(c) requires a RICO person and a separate RICO enterprise. 18 U.S.C. § 1962(c); Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001) ("to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an

42 - OPINION & ORDER

'enterprise' that is not simply the same 'person' referred to by a different name.").

RISO argues that under Massachusetts law, which governs the 2005 and FY 2008 Dealer Agreements, "[a]n agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E. 2d 1113, 1119 (Mass. 2000). Because William Witt and Edner are alleged to be RICO persons who used the separate RICO enterprise, Witt Company, to carry out their alleged illegal racketeering activity, RISO argues that William Witt and Edner could not have been acting on behalf of Witt Company or for the benefit of Witt Company. Instead, Witt Company was, in regard to the RICO claims, a conduit for William Witt and Edner's alleged illegal racketeering, "not a complicit partner in the scheme." RISO's Opp. Mem. at 31.

RISO cites no cases holding that an arbitration provision cannot apply under agency principles to RICO persons who owned, or were employed by, the RICO enterprise. Instead, it relies on a 2004 Ninth Circuit case in which the Ninth Circuit considered a section 1962(c) RICO claim by a former employee of Yokohama Tire Corporation based on the alleged failure of Yokohama to pay him overtime. Miller v. Yokohama Tire Corp., 358 F.3d 616, 619-20 (9th Cir. 2004). The plaintiff alleged that several Yokohama managers falsely represented to him and other employees that the employees were not entitled to overtime pay because they were salaried. He asserted that the misrepresentations and failure to pay overtime wages constituted a fraudulent scheme and that the mailing of paychecks, or the wiring of direct deposits, constituted the predicate acts of mail or wire fraud through which the alleged fraudulent scheme occurred. Id. at 618-19.

43 - OPINION & ORDER

The court considered whether the plaintiff's RICO claim against Yokohama, rather than the individual managers, could survive the defendants' motion to dismiss.  Because the plaintiff had named Yokohama as a defendant in the RICO claim on a respondeat superior liability theory and not because the plaintiff believed that Yokohama was directly liable, the question was whether Yokohama could be vicariously liable for its employees' RICO violations.  Id. at 619-20.  The court answered that it could not:  "Vicarious liability is inappropriate when the employer is the RICO enterprise."  Id. (internal quotation marks and brackets omitted).  No respondeat superior liability existed.

Relying on Miller, RISO argues that in the RICO claims, one cannot align the interests of William Witt and Edner on the one hand and the separate RICO enterprise Witt Company on the other.  RISO argues that the individual Defendants were acting contrary to the interests of Witt Company by using it as their vehicle to conduct their criminal activity.

I reject RISO's argument.  The fact that Witt Company is alleged to be a distinct enterprise does not necessarily mean that the individual Defendants were not acting for the benefit of Witt Company.  The individuals' actions are not inherently contrary to the interests of the enterprise simply because the entity is distinct.

Miller addressed a more discrete issue, making it distinguishable.  The narrow question was whether the plaintiff could assert a RICO claim against the employer (the RICO "enterprise") through which the individual defendants (the RICO "persons") carried on their allegedly fraudulent scheme, on a respondeat superior theory.  Here, RISO does not bring its RICO claims against Witt Company at all.  The RICO claims are brought only against the individual Defendants.  No respondeat superior theory of liability is alleged.

44 - OPINION & ORDER

Cedric Kusher can be read to support Witt Company's position that the arbitration provision applies to the RICO claims against the individual Defendants.  There, the Court was presented with a RICO claim in which the RICO "person" was the president and sole shareholder of a closely held corporation which was the RICO "enterprise" and where the plaintiff claimed that the president conducted the corporation's affairs through the forbidden "pattern."  The circuit courts were split as to whether, in such a scenario, the "person" and the "enterprise" were or were not distinct entities.  The Supreme Court concluded that "the 'person' and 'enterprise' here are distinct and that the RICO provision applies."  533 U.S. at 160.

As the Court noted, when the "person" who is a president or sole shareholder of an entity is alleged to have acted within his or her authority, the person is separate from the entity for RICO purposes.  I read this to mean that an employer/sole shareholer/president who is acknowledged to be acting within the scope of his or her authority and for the benefit of the corporation can nonetheless be recognized as a distinct entity from the corporation itself, allowing a RICO claim to be brought.  But, the Court understood that just because the person is a separate entity from the corporation/enterprise does not preclude a finding that the person was acting in the interest of the corporation.  In fact, the Court noted that its conclusion "does not deny that a corporation acts through its employees; it says only that the corporation and its employees are not legally identical." Id. at 166.  And, the Court recognized that RICO's statutory history establishes that the statute was intended to not only "undermin[e] organized crime's influence upon legitimate businesses[,] but also . . . to protect the public from those who would run organization[s] in a manner detrimental to the public interest." Id. at 165 (internal quotation marks omitted) (also noting that the Court itself had held that RICO is aimed at "high-ranking

individuals in an illegitimate criminal enterprise, who, seeking to further the purposes of that enterprise, act within the scope of their authority.").

The law recognizes the person and the enterprise as distinct for the purposes of bringing a RICO claim against the enterprise.  The law does not allow a plaintiff to base a claim against the alleged employer for acts by its employees on a theory of respondeat superior liability when the employer is the enterprise.  But, as <u>Cedric Kushner</u> suggests, RICO is intended to target persons who create or manage businesses for an ulterior purpose.  I reject RISO's argument that a contractual arbitration provision does not apply to individual non-signatories of that contract in a RICO claim because the individuals and the corporate enterprise are distinct entities.  The law does not support the contention that where those individuals are upper management, officers, the president, or the owner of the enterprise, they, as a matter of law in a RICO claim, acted contrary to the enterprise's interests.  Thus, without more specific authority on this issue, the individual Defendants may invoke the arbitration provision as to all the claims brought against them.

V.  The Suit on Account and Lanham Act Claims

Count VI is for "suit on account" against Witt Company.  There, RISO alleges that it has furnished Witt Company with equipment, parts, and supplies in the total amount of $123,819.68 and that Witt Company has failed to pay the amount owed as well as the $20,560.85 in interest that has accrued.  <u>Id.</u> at ¶¶ 123, 124.

Count IX is an unfair competition Lanham Act claim under 15 U.S.C. § 1125[5] contending

---

[5]  The caption of this Count suggests that the claim is for both unfair competition and trademark infringement, but RISO expressly states in the briefing that the inclusion of the reference to trademark infringement was inadvertent. RISO's Opp. Mem. at 25 (RISO "is asserting a claim for Lanham Act/unfair competition for *false association*-RISO is *not* asserting a claim for trademark infringement").

that Witt Company continues to attempt to associate itself with RISO as an authorized dealer, including but not limited to representations made on Witt Company's website, despite the termination of its authorized dealer status on May 31, 2013. Id. at ¶ 189. RISO contends that Witt Company's representations are likely to cause confusion or mistake or to deceive as to the affiliation, connection, or association of Witt Company with RISO, or as to the origin, sponsorship, or approval by RISO of Witt Company through its goods or commercial activities. Id. at ¶ 191. RISO seeks both injunctive relief and damages on the Lanham Act claim. Id. at ¶¶ 192-95.

    A.  Count VI - Suit on Account

Witt Company points to Paragraphs 1(a) and 2(b) of the FY 2008 Dealer Agreement to argue that this claim arises from that Dealer Agreement and is therefore subject to the Agreement's arbitration provision. Under Paragraph 1(a), RISO appoints the Dealer and the Dealer accepts the appointment, as a non-exclusive authorized dealer for the promotion of RISO products and supplies, etc. B. Witt Feb. 13, 2014 Decl., Ex. 4 at 1. Under Paragraph 2(b), the Dealer is required to pay RISO for products as invoiced by RISO. Id. at 2. That paragraph also addresses the interest rate, etc. for failure to timely pay the amounts owed. Id.

RISO contends that Count VI does not arise out of the FY 2008 Dealer Agreement because the amounts sought to be collected are for purchases made by Witt Company after the FY 2008 Dealer Agreement expired. RISO does not argue that had these purchases occurred during the life of the FY 2008 Dealer Agreement, the arbitration provision would not apply. The purchases and terms of interest are expressly governed by the Agreement and thus, there is no dispute that had the purchases occurred before the Agreement expired, they would have arisen

47 - OPINION & ORDER

out of the Agreement and the arbitration provision would apply.  For the reasons explained

above, the parties manifested a mutual assent to extend the FY 2008 Dealer Agreement until May

13, 2013 when Witt Company's status as an authorized dealer was terminated.  Thus, because the

parties were governed by the terms of the FY 2008 Dealer Agreement when the purchases

occurred, the purchases arise out of the Agreement and Count VI is subject to the arbitration

provision.

      B.  Lanham Act Claim

      Witt Company contends that the Lanham Act claim, which is based solely on conduct

occurring after its authorized dealer status terminated on May 31, 2013, is arbitrable under the

FY 2008 Dealer Agreement because Witt Company's use of RISO's trademarks is governed by

the terms and conditions of RISO's Dealer Agreements.  Under Paragraph 7(b) of the FY 2008

Dealer Agreement, RISO grants the dealer the non-exclusive privilege to use and display RISO

trademarks in connection with the sale and service of products under the agreement.  B. Witt Feb.

13, 2014 Decl., Ex. 4 at 7.  That provision states that the "term of such privilege shall terminate

upon the termination of this Agreement."  Id.  Paragraph 7(d) provides further that the dealer

agrees to discontinue immediately, at its sole cost and expense, any display of RISO trademarks

which RISO finds misleading or confusing as to the rights or status of the dealer.  Id.

      Witt Company argues that because RISO brings the Lanham Act claim to enforce the

rights and obligations set out in Paragraphs 7(b) and 7(d) with respect to Witt Company's use of

RISO's trademarks, RISO's claim clearly arises out of the parties' Dealer Agreement and is thus

subject to arbitration.  Witt Company does not dispute that to the extent RISO seeks injunctive

relief, that part of the claim is outside the scope of the arbitration provision.  But, it argues that

the injunctive relief claim is moot because Witt Company has removed from its website all references to RISO or RISO products, including any use of RISO's trademarks or trade names.

In response, RISO asserts that its Lanham Act claim is not based on and does not reference any provision of any Dealer Agreement. RISO notes that the actual allegations in the First Amended Complaint do not refer to a continued use of a trademark but to Witt Company's alleged false and misleading "representations." RISO states that Witt Company's argument misses the mark because it is erroneously premised on a trademark claim which RISO does not bring.

I agree with RISO that the injunctive relief portion of the claim is not moot. Statements made in the context of a motion to compel arbitration are not sufficient to moot the claim. Additionally, as RISO notes, William Witt's Declaration does not address other ways in which Witt Company may be falsely associating itself with RISO such as Facebook or through references to capabilities of machines on Witt Company's website that can be supplied only by RISO.

I agree with Witt Company, however, as to the damages portion of the Lanham Act claim. As explained by Judge Papak in a 2011 case, "[t]rade names are symbols used to distinguish companies, partnerships and businesses, and symbolize the reputation of a business as a whole. Bobosky v. Adidas AG, 843 F. Supp. 2d 1134, 1147 (D. Or. 2011). As he noted, "[t]he Lanham Act defines trade names as 'individual names and surnames, firm names and trade names used by manufacturers, industrialists, merchants, agriculturalists, and others to identify their businesses, vocations, or occupations . . . .'" Id. (quoting 15 U.S.C. § 1127). "A corporate name is the most common example of a trade name." Id. Thus, based on the law, "RISO" is a trade name.

49 - OPINION & ORDER

The FY 2008 Dealer Agreement grants RISO authorized dealers the "non-exclusive privilege to use and display RISO Trademarks in connection with the sale and service of Products under this Agreement."  B. Witt Feb. 13, 2014 Decl., Ex. 4 at 7.  Paragraph 7(a) of that agreement defines "RISO Trademarks" broadly to include RISO's "trademarks, service marks, and trade names[.]"  Id. (emphasis added).  And, as noted above, the FY 2008 Dealer Agreement expressly addresses a dealer's unauthorized use of RISO's "Trademarks," providing that the privilege to use them terminates upon the termination of the agreement and that an authorized dealer shall discontinue any use of RISO trademarks that are "misleading or confusing as to the rights or status of the Dealer under this Agreement."  Id.

Because it is only by virtue of Paragraph 7(b) of the FY 20078 Dealer Agreement that Witt Company had any right to associate itself with RISO by using RISO's trade name in the first place, and RISO is now seeking damages from Witt Company's alleged use of the trade name in violation of Paragraphs 7(b) and (d) of that agreement (or seeking to enjoin Witt Company from continuing to use the trade name), the Lanham Act claim arises under the terms and conditions of the FY 2008 Dealer Agreement and is subject to the arbitration provision.  As indicated above, the termination of an agreement does not extinguish the duty to arbitrate a dispute when the dispute concerns an action taken after the termination but which infringes a right that accrued or vested under the agreement.  Newmont Min. Corp., 476 F.3d at 692 (relying on Nolde and Litton); see also Litton, 501 U.S. at 206 (post-termination dispute arises under the terminated agreement where it involves rights or liabilities accrued or vested under the agreement).  Thus, the fact that the challenged conduct occurred after May 31, 2013 does not affect the arbitrability of the claim.

50 - OPINION & ORDER

CONCLUSION

I grant Witt Company's motion to dismiss [30] as to all claims except the injunctive relief portion of the Lanham Act claim.  The Court will schedule a telephone conference with counsel regarding that portion of the Lanham Act claim.

IT IS SO ORDERED.

Dated this _____9_____ day of _____July_____, 2014

_____
Marco A. Hernandez
United States District Judge

51 - OPINION & ORDER